Nos. 15-1400 (L) and 15-1490
Consolidated with Nos. 15-1586, 15-1639

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

In re Capital One Telephone Consumer Protection Act Litigation,
APPEAL OF: Jeffrey Collins, *et al.*, Objectors-Appellants
Devera R.D. Bartte, Objector-Appellant
Pamela McCoy, Objector-Appellant

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,
Judge James F. Holderman

---

Plaintiffs-Appellees' Brief in Response

---

LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
Jonathan D. Selbin
Douglas Cuthbertson
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000

*Counsel of Record*

TERRELL MARSHALL DAUDT & WILLIE PLLC
Beth E. Terrell
936 North 34th Street, Suite 400
Seattle, WA  98103
Telephone:  (206) 816-6603

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: _____

Short Caption: __IN RE: CAPITAL ONE TELEPHONE PROTECTION ACT LITIGATION_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

    [  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Bridgett Amadeck, David Mack, Charles C. Patterson, Tiffany Alarcon, and Andrew Kalik.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Lieff, Cabraser, Heimann, & Bernstein, LLP; Terrell Marshall Daudt & Willie, PLLC; Keogh Law, Ltd.;

    Burke Law Offices, LLC; Williamson & Williams; and Meyer Wilson Co., LPA

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: __/s/ Jonathan D. Selbin_____  Date: _6/17/17_____

Attorney's Printed Name: __Jonathan D. Selbin_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).  Yes _X____  No _____

Address: __250 Hudson Street, 8th fl._____

      _New York, NY 10013-1413_____

Phone Number: _212-355-9500_____  Fax Number: _212-355-9592_____

E-Mail Address: _jselbin@lchb.com_____

1261968.3

# TABLE OF CONTENTS

**Page**

Jurisdictional Statement ................................................................................. 1

Statement of Issues...................................................................................... 1

Statement of the Case .................................................................................. 2

      A.     Separate Litigation ............................................................... 2

      B.     The MDL ............................................................................. 4

      C.     The Settlement ..................................................................... 5

      D.     Notice and Class Member Response ...................................... 6

      E.     Practice Changes ................................................................. 6

      F.     Monetary Relief ................................................................... 7

      G.     Attorneys' Fees and Incentive Awards.................................... 7

      H.     The Expert Reports and CCAF Objection............................. 8

      I.     Final Approval and Attorneys' Fees .................................... 11

Summary of Argument ................................................................................ 12

Standard of Review..................................................................................... 15

Argument .................................................................................................. 15

   I.     The District Court Properly Approved the Settlement. ............................... 15

      A.     The Settlement Provides Real Relief. ................................. 16

      B.     There Are No "Red Flags." ................................................ 17

      C.     Professional Objectors ...................................................... 18

   II.     The District Court Did Not Abuse its Discretion in Awarding Fees of 20.77% of the Non-Reversionary Cash Fund............................................ 19

      A.     The District Court Applied A Market Approach. ........................... 20

      B.     The CCAF Model is An Entirely *Ex Post* Central Planning Model With Predictably Perverse Incentives and Outcomes......... 24

            1.     The CCAF Model Assesses Fees Across Unrelated Cases. ................................................................. 24

            2.     The CCAF Model Relies Solely Upon *Ex Post* Information. ......................................................... 25

## TABLE OF CONTENTS
### (continued)

Page

3.   The CCAF Model Is Bad Economic Theory that Contravenes the Actual *Ex Ante* Legal Market and Measures Only Lodestar. ........................................................ 27

4.   The CCAF Model Creates Perverse Incentives and Outcomes. ................................................................................ 32

5.   No Case Supports the CCAF Model. ..................................... 34

6.   Heads CCAF Wins, Tails Class Counsel Lose. ..................... 37

C.   The District Court Properly Declined to Intrude Upon Private Market Fee Allocation. .................................................. 39

1.   No Authority Requires Courts to Evaluate Fee Allocation Agreements. ....................................................... 39

2.   Appellants' Proposed Rule is Bad Policy. ........................... 43

3.   There is No Price Fixing. ....................................................... 45

D.   There is No Basis—or Sound Reason—for Overruling this Court's Longstanding Fee Jurisprudence. ......................................... 47

Conclusion ................................................................................................. 49

Statement Regarding Oral Argument ................................................................ 51

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d) ........ 52

Proof of Service ........................................................................................... 53

## Cases

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.,*
743 F.3d 243 (7th Cir. 2014) ................................................................ 15, 17, 18

*Balschmiter v. TD Auto Fin. LLC,*
303 F.R.D. 508 (E.D. Wis. 2014) .................................................................... 23

*Barnes v. FleetBoston Fin. Corp.,*
No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ..................... 18

*City of Burlington v. Dague,*
505 U.S. 557 (1992) ...................................................................................... 47

*Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc),
2013 U.S. Dist. LEXIS 163118 (S.D. Cal. Nov. 14, 2013) .................................... 19

*Eubank v. Pella Corp.*
753 F.3d 718 (7th Cir. 2014) ..................................................................... 18, 19

*Florin v. Nationsbank, N.A.,*
34 F.3d 560 (7th Cir. 1994) ....................................................................... 35, 48

*Gusman v. Comcast Corp.,*
298 F.R.D. 592 (S.D. Cal. 2014) ...................................................................... 26

*Harman v. Lyphomed, Inc.,*
945 F.2d 969 (7th Cir. 1991) ........................................................................... 15

*In re "Agent Orange" Prods. Liab. Litig.,*
818 F.2d 216 (2d Cir. 1987) ....................................................................... 41, 42

*In re Auction Houses Antitrust Litig.,*
197 F.R.D. 71 (S.D.N.Y. 2000) ........................................................................ 22

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.,*
288 F.3d 1012 (7th Cir. 2002) ..................................................................... 15, 33

*In Re Comdisco Sec. Litig.,*
150 F. Supp. 2d 943 (N.D. Ill. 2001) ................................................................ 34

*In re Continental Illinois Sec. Litig.,*
962 F.2d 566 (7th Cir. 1992) ..................................................................... passim

*In re Diet Drugs Prods. Liab. Litig.,*
401 F.3d 143 (3d Cir. 2005) ........................................................................... 43

*In re High Sulfur Content Gasoline Prods. Liab. Litig.,*
517 F.3d 220 (5th Cir. 2008) ...................................................................... 40, 41

*In re Synthroid Mktg. Litig.,* 264 F.3d 712 (7th Cir. 2001) ................................................. 12, 20

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,*
No. 8:10ML 02151, 2013 U.S. Dist. LEXIS 123298 (C.D. Cal. July 24, 2013) ................. 43

*In re Trans Union Corp. Privacy Litig.,*
629 F.3d 741 (7th Cir. 2011) ........................................................................... 12

*In re Warfarin Sodium Antitrust Litig.*,
     212 F.R.D. 231 (D. Del. 2002) ................................................. 43

*Kirchoff v. Flynn*,
     786 F.2d 320 (7th Cir.1986) .................................................... 38

*Mercury Interactive Corp. Sec. Litig.*,
     618 F.3d 988 (9th Cir. 2010) .................................................. 40

*Mims v. Arrow Financial Services, LLC*
     132 S. Ct. 740, 744 (2012) ..................................................... 33

*Murray v. GMAC Mort. Corp.*,
     434 F.3d 948 (7th Cir. 2006) .................................................. 16

*Pearson v. NBTY, Inc.*,
     772 F.3d 778 (7th Cir. 2014) .................................................. 17

*Pearson v. NBTY, Inc.*,
     772 F.3d 778 (7th Cir. 2014) .................................................. 22

*Perdue v. Kenny A.*,
     559 U.S. 542 (2010) ............................................................... 47

*Redman v. Radioshack Corp.*,
     768 F.3d 622 (7th Cir. 2014) .................................................. 17

*Silverman v. Motorola Solutions, Inc.*,
     739 F.3d 956 (7th Cir. 2013) ........................................... passim

*Spokeo, Inc. v. Robins*,
     742 F.3d 409 (9th Cir. 2014), *cert granted*,
     83 U.S.L.W. 3819 (U.S. Apr. 27, 2015) ................................ 27

*Swedish Hosp. Corp. v. Shalala*,
     1 F.3d 1261 (D.C. Cir. 1993) .................................................. 48

*Taubenfeld v. AON Corp.*,
     415 F.3d 597 (7th Cir. 2005) .................................................. 15

*Vollmer v. Selden*,
     350 F.3d 656 (7th Cir. 2003) .................................................. 18

*Warnick v. Dish Network LLC*,
     301 F.R.D. 551 (D. Co. 2014) ................................................ 23

## Statutes

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1332(d)(2) ................................................................ 1

28 U.S.C. § 1715 ......................................................................... 6

Telephone Consumer Protection Act, 47 U.S.C. § 227 ................. 1, 33

## Rules

Fed. R. Civ. P. Rule 23(b)(3) ................................................................. 5

Fed. R. Civ. P. Rule 23(g) ..................................................................... 4

Fed. R. Civ. P. Rule 26(f) ..................................................................... 4

## Other Authorities

Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee
     Awards, 7 J. Empirical L. Stud. 811 (2010) ................................................ 10, 21

Brian T. Fitzpatrick, The End of Objector Blackmail,
     62 Vand. L. Rev. 1623, 1636 (2009) ......................................................... 18

Joseph A. Grundfest and Peter H. Huang, "The Unexpected Value of Litigation: A Real
     Options Perspective," 58 STAN. L. REV. 1267 (2006), 1320, n. 140 ............................... 32

Joseph E. Stiglitz, Information and the Change in the Paradigm of Economics, Part I,
     The American Economist 8 (Spring 2004) ..................................................... 30

Manual for Complex Litigation, Fourth ("MCL 4th"), §21.272 ............................................ 4

Report of the Third Circuit Task Force, reprinted in 108 F.R.D. 237, 242–46 (1985) ........ 48

## Jurisdictional Statement

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (1991)("TCPA"), and under 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeded $5,000,000, exclusive of interest and costs, and many Class members, including certain Plaintiffs, are citizens of a different state than Defendants.

This Court has jurisdiction under 28 U.S.C. § 1291. On February 12, 2015, the District Court granted final approval of the class action settlement, and granted in part and denied in part Class counsel's motion for attorneys' fees; it entered judgment on February 23, 2015. Objectors noticed appeals on February 27, March 6, March 13, and March 17, March 24.[1]

## Statement of Issues

1.    Where 1,378,534 Class members will receive cash payments of $39.66 each, after direct individual notice to over 91% of the Class, as compared to 14 timely objections and 462 timely opt-outs, did the District Court abuse its discretion by approving a settlement consisting of a) a $75,455,098.74 non-reversionary cash fund and b) Capital One's implementation of a protocol governing its use of automatic dialers to call cell-phones that brings it into compliance with Plaintiffs' interpretation of TCPA requirements, i.e. the very practice changes Plaintiffs sought?

2.    Did the District Court abuse its discretion in awarding attorneys' fees and costs of 20.77% of the $75,455,098.74 non-reversionary cash fund—against which

---

[1] Collins dismissed his appeal. Dkts. 57, 58. Van Wieren moved to dismiss her appeal. Dkt. 59.

1,378,534 Class members made claims for pro rata recovery of $39.66 each—after permitting objectors unprecedented discovery into Class counsel's litigation of dozens of unrelated TCPA cases, weighing competing expert opinions, conducting its own analysis of the field of TCPA litigation, and issuing a detailed ruling that applied a tiered percentage to approximate the *ex ante* fee?

      3.     Did the District Court abuse its discretion by declining to intrude upon Class counsel's fee allocation agreement where no counsel disputes allocation and it has zero effect on Class recovery?

      4.     Should this Court overrule longstanding precedent and adopt a pure lodestar-based attorneys' fee regime that fails to mimic the market or compensate lawyers for risk of nonpayment?

<b>Statement of the Case</b>

**A.**    <u>**Separate Litigation**</u>

Plaintiffs commenced four separate TCPA class actions against Defendant Capital One and/or its vendors.

***Martin/Mack*:**

Plaintiff Martin filed suit in Northern District of Illinois on August 25, 2011; Plaintiff Mack joined January 18, 2012. *See Martin v. Leading Edge Recovery Solutions, LLC*, 1:11-cv-05886. Capital One filed Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motions, which were denied. *See* (*Id.*, Dkt. 84). The parties engaged in discovery and related motion practice (*see id.*, Dkt. 87)) until the case transferred into the MDL (*id.*, Dkt. 115)).

***Amadeck/Hansen*:**

Plaintiffs Amadeck and Hansen filed suit on January 20, 2012 in Washington state court; Capital One removed.  *See Amadeck et al. v. Capital  One Financial Corp. and Capital One Bank (USA) NA*, 12-cv-00244 (W.D. Wash.).[2]  Plaintiffs had served discovery, and moved for leave to amend the complaint and modify the scheduling order, when the case was stayed pending ruling on MDL transfer.  *See id.*, (Dkt. 45).

### *Patterson*:

Plaintiff Patterson filed suit on February 14, 2012 in the Northern District of Illinois.  *See Patterson v. Capital Management Services, LP and Capital One Bank (USA) N.A.*, 12-cv-01061.[3]  Capital One moved to dismiss for lack of subject matter jurisdiction (*see id.*, (Dkt. 28)); that motion was denied.  Patterson served class discovery, and the court granted his motion to compel, when the case was stayed pending ruling on MDL transfer.  *See id.* (Dkt. 67.)

### *Alarcon*:

Plaintiff Alarcon filed suit on August 7, 2012 in the Northern District of California.  *See Alarcon v. Cap. One Bank (USA) N.A., et al.*, Civ. 3:12-CV-4145 (N.D. Cal.).[4]  Alarcon voluntarily dismissed on October 1, 2012 to join the *Amadeck* Action. *Id.*, Dkts. 34 & 36.  She moved to add herself to *Amadeck*, which was denied without prejudice pending MDL transfer.  *Id.*, *Amadeck et al. v. Capital One Financial Corp. and Capital One Bank (USA) NA*, 12-cv-00244 RSL (W.D. Wash.), Dkt. 45.  Alarcon formally

---

[2] Williamson & Williams and Terrell Marshall Daudt & Willie PLLC represented Amadeck and Hansen.

[3] Keogh Law, Ltd. represented Patterson.

[4] Lieff Cabraser Heimann & Bernstein, LLP and Meyer Wilson Co., LPA represented Alarcon.

rejoined the case once it transferred into the MDL. *See* Dkt. 19 (Consolidated Master

Complaint), ¶¶ 10, 35-37; *see also* Dkt. 263 (Selbin Final Approval Decl.) ¶ 10.

**B.    The MDL**

Capital One initiated proceedings before the Judicial Panel on Multi-District

Litigation on October 3, 2012. *All* Plaintiffs *opposed* transfer. *See* Dkt. 1 (JPML Transfer

Order), at 1. The JPML centralized the cases in the Northern District of Illinois. *Id.*

Counsel initiated the "private ordering" process recommended by the Manual

for Complex Litigation, Fourth ("MCL 4th"), §21.272, to discuss a proposed leadership

structure. *See* Dkt. 6 (26(f) Report), at 1. They proposed Beth Terrell of Terrell Marshall,

and Jonathan Selbin of Lieff Cabraser, as co-lead class counsel, and Keith Keogh as

liaison counsel. *Id.* The Court approved that structure following a Rule 23(g) motion.

*See* Dkts. 11 and 12. Plaintiffs filed a master complaint governing all class cases (and

including Alarcon as Plaintiff) on February 28, 2013. *See* Dkt. 19 (Complaint), ¶¶ 10, 35-

37.

The parties conducted a Rule 26(f) conference, negotiated an E-Discovery Plan

and proposed Case Management Order, and met and conferred about a potentially

case-dispositive issue: whether Capital One's Customer Agreement constituted prior

express consent within the meaning of the TCPA. Plaintiffs analyzed a complete set of

the relevant Agreements. *See* Dkt. 329 (Opinion), at 16. As the parties prepared for

motion practice, they began to discuss mediating, and conducted class-wide discovery.

*Id.* at 4, 16. Over a six-month period, Capital One produced, and Plaintiffs analyzed,

substantial class data and documents.

Between July 2013 and February 2014, the parties held three in-person and multiple telephonic mediation sessions before the Honorable Edward A. Infante (Ret.) of JAMS.  *Id.* at 4.  Per Judge Infante, the negotiations were adversarial, non-collusive, and arm's-length, and almost broke down several times.  Dkt. 131-2 (Infante Decl.), ¶¶ 6, 8-10.  The parties reached agreement only after a mediator's proposal, and spent months negotiating the actual agreement.  *Id.*, ¶ 9; *see also* Dkt. 329 (Opinion), at 4.

### C.     The Settlement

The Rule 23(b)(3) opt-out Settlement Class is defined as:

> All persons within the United States who received a non-emergency telephone call from Capital One's dialer(s) to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt from January 18, 2008, through June 30, 2014, and all persons within the United States who received a non-emergency telephone call from a Participating Vendor's dialer(s) made on behalf of Capital One to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt from February 28, 2009, through June 30, 2014.

Dkt. 131-1 (Agreement), § 2.38.  The Settlement included Capital One and several participating vendors.  *See* Dkt. 329 (Opinion), at 4.

Capital One and the vendors agreed to create a $75,455,098.74 non-reversionary cash fund, and Capital One implemented protocols governing its use of automatic dialers to call cell-phones that brings it into compliance with *Plaintiffs'* interpretation of the TCPA.  Dkt. 329 (Agreement), § 4.01; Dkt. 263 (Selbin Final Approval Decl.), ¶¶ 20-21.

### D.    Notice and Class Member Response

The notice plan is detailed in Capital One's brief.  Suffice it to say here that it was state-of-the-art and comprehensive, with direct individual notice to well over 90% of the Settlement Class. *See* Dkt. 305 (12/23/14 Brown Decl.), ¶ 6, supplemented by targeted internet banner notices, a Settlement website and toll-free number, and governmental notice pursuant to 28 U.S.C. § 1715.  Dkt. 329 (Opinion), at 4-5.  The Notice contained *all* required information about the case, and referred Class members to a Settlement website and toll-free number for additional information.  *See* Dkt. 264 (11/18/14 Brown. Decl.), Exs. 2-4. It also estimated a pro rata recovery of $20 and $40, depending upon claims rates.  *See Id.*

Filing a claim was "exceedingly easy."  *See* Dkt. 329 (Opinion), at 18.  It required only returning a pre-paid postcard claim form, completing a simple online form, or calling a toll-free number.  *See* Dkt. 264 (Brown Decl.), ¶ 33.

Class member response was overwhelmingly positive: 1,378,534 submitted timely claims.  *See* Dkt. 329 (Opinion), at 5.  There were 14 timely objections and approximately 500 Class members opted-out.  *Id.* at 15-16.  No governmental entity objected.

### E.    Practice Changes

Capital One implemented significant systems changes to prevent autodialer calls to cell-phones without prior express consent.  *See* Dkt. 329 (Agreement), § 4.01.

Capital One will not call cell-phone numbers if the called party so requests, even though Capital One maintains its Cardholder Agreements establish irrevocable prior express consent. *See* Dkt. 262 (Final Approval Brief), at 7.

Capital One will place autodialed calls to cell-phones only where the number was provided on the credit application. Dkt. 329 (Opinion), at 7. Capital One's practices now comply with Plaintiffs' interpretation of "prior express consent" under the FCC's 2008 Declaratory Ruling. *Id.*

Capital One will only dial cell-phone numbers: (1) specifically linked to the customer's name based on third party research; or (2) if Capital One contacted a customer at that number within the past 90 days. *Id.* at 7.

### F. Monetary Relief

The Settlement creates a non-reversionary cash Settlement Fund of $75,455,098.74. The 1,378,534 Class members who claimed will receive at least $39.66 each. *Id.* at 5, 42.

### G. Attorneys' Fees and Incentive Awards

Neither attorneys' fees nor incentive awards for the Class Representatives were discussed until all material terms of the Settlement were agreed upon. *See* Dkt. 263 (11/18/14 Selbin Final Approval Decl.) ¶ 15.

Under the Settlement, Class counsel were permitted to seek up to 30% of the Settlement Fund. The Notice disclosed this amount. Dkt. 131-1 (Agreement), § 5.01. There is no provision for early payment of Class counsel's fees—they get paid, like the Class, only upon finality. Class counsel filed their fee motion on September 29, 2014, 28

days before the notice and opt-out deadline and was posted on the Settlement website

for easy review by Class members.  *See* Dkt. 264 (11/18/14 Brown. Decl.), ¶ 26.

### H.    The Expert Reports and CCAF Objection

Jeffrey Collins, formerly represented by the Center for Class Action Fairness

("CCAF"), objected to Class counsel's 30% fee request as excessive, arguing for

application of diminishing marginal rates. Dkt. 197 (Collins Objection), at 5.  Collins

sought discovery on Class counsel's lodestar and costs in this and all *other* TCPA class

cases they litigated.  *See* Dkts. 191, 191-1 (Collins Motion to Lift Stay), at 5.  The District

Court lifted the discovery stay and ordered production.  Dkt. 209 (Order).

On November 18, 2014, Plaintiffs moved for attorneys' fees, supported by expert

reports from Professors Brian T. Fitzpatrick of Vanderbilt Law School, (Dkt. 270), and

David Rosenberg of Harvard Law School.  (Dkt. 271).  Professor Fitzpatrick opined that:

(1) "[t]he percentage method, rather than lodestar[] method best approximates the

market for legal services;" (2) "[a]lthough the Seventh Circuit has not yet squarely

addressed whether courts should use a lodestar 'crosscheck' along with the percentage

method, it seems clear that the lodestar crosscheck is antithetical to its market-based

approach;" and (3) "[t]he fee percentage requested here is consistent with the market for

legal services." Dkt. 270 (Fitzpatrick Report), ¶ 4.  Professor Rosenberg opined that in a

"true" common fund case, percentage-of-the-fund is "far and away superior to use of

the lodestar method either alone or as a cross-check."  *Id.* ¶ 6.

Collins filed a supplemental brief.  *See* Dkt. 293 (Collins Br.)  Abandoning his

previous argument for "diminishing marginal rates," he argued for a flat 4.6%, relying

on model created by Professor M. Todd Henderson ("CCAF Model"). *See* Dkt. 294 (Henderson Report). Professor Henderson totaled the lodestar from Class counsel's TCPA cases over the prior four-year period, and concluded that "for any given hour devoted to TCPA litigation, class counsel has a better than even chance of collecting contingent fees: 64% chance per dollar invested, to be precise." *Id.* ¶ 3. Henderson contended that an "an average multiplier of 1.57 or the reciprocal of 64% . . . would be sufficient to compensate class counsel in *all* TCPA litigation." *Id.* (emphasis in original). Henderson further asserted that "in an efficient market for legal services" the percentage of the recovery and the lodestar method would produce "approximately the same" compensation. *Id.* ¶ 8.

Plaintiffs responded, again supported by Professors Fitzpatrick and Rosenberg, who detailed the flaws in the CCAF Model. *See* Dkt. 302 (Resp. Br.); Dkt. 302-2 (Fitzpatrick Supp. Report); Dkt. 302-3 (Rosenberg Supp. Report).

First, utilizing data solely from cases resolved *after* this case was filed provides no insight into the *ex ante* market. Dkt. 302 (Resp. Br.), at 3-4; *see also* Dkt. 302-3 (Rosenberg Supp. Report), ¶ 8. The assumption that Class counsel had perfect information *ex ante* about the outcome of this and every one of their then-pending TCPA cases was wrong. Henderson "assume[d] that $75.5 million was the expected value of settlement (if the case settled) ex ante," and then "further assume[d] that $2.213 million of lodestar was the expected value of lodestar to reach settlement," to conclude that a contingency fee of 4.61% sufficed. Dkt. 294 (Henderson Report), ¶ 20. Professor Fitzpatrick explained why that's nonsense: "all of the data relied upon by Professor

- 9 -

Henderson was unknown to the lawyers here at the time they filed this lawsuit; all of the fees from other cases on which Professor Henderson relies were awarded *after* this case was filed. At the time this case was filed, it was, so to speak, still a shot in the dark. Professor Henderson's equations offer no assistance to the Court in cases—like this one—where there was no data to plug into them."  Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 13.

Second, the CCAF Model failed to address Fitzpatrick's empirical market analysis, which concluded that the median fee percentage in this Circuit is 29%.  Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, 836 (2010); *see also* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 3; Dkt. 270 (Fitzpatrick Report), ¶ 12.  Absent evidence that courts systemically misapplied Circuit precedent, this data better reflects the *ex ante* market than Henderson's assumptions based on *ex post* data.  Dkt. 270 (Fitzpatrick Report), ¶ 4 n.2.

Third, the CCAF Model does not model *any* market, but is a pseudo-mathematical justification for a pre-selected policy outcome: lodestar-based compensation.  "[I]t is essentially the lodestar method, masked in business school lingo to obscure its arbitrary assumptions and rejection of the ex ante market approach for class action fee awards."  Dkt. 271 (Rosenberg Supp. Report), ¶ 1; *see also* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 6 ("[I]t is clear that [CCAF] and Professor Henderson actually ask the Court to apply the lodestar method instead . . . .").  While Henderson claims to incorporate the notion of additional compensation for risk of non-payment,

the CCAF Model sets the risk factor ("e") at 1—writing it out of the equation. Dkt. 270 (Fitzpatrick Supp. Report), at ¶ 9.

Fourth, the CCAF Model "requires a mindboggling amount of data—and an equally mindboggling amount of time and effort by courts to collect and analyze it" and it is not clear how "a court would even begin to calculate this 'e' factor." Dkt. 302-2 (Fitzpatrick Supp. Report), at ¶ 14 (internal citations omitted)). Because "the court would have to po[re] over all of this data and do all of this math in every case because the wins, losses, and profits and losses will change over time," Fitzpatrick concluded that the CCAF Model is "the old lodestar method . . . but on steroids. And it's enough to make even the most ambitious price-setting central planner blush." *Id.*; *see also* Dkt. 302-3 (Rosenberg Supp. Report), ¶ 1.

## I.    Final Approval and Attorneys' Fees

The District Court conducted a lengthy fairness hearing on January 15, 2015; CCAF counsel argued. *See* Dkt. 324 (H'rg Tr.). A month later, the District Court granted final approval, and thoroughly analyzed Class counsel's fee request. *See* Dkt. 329 (Opinion), at 3, 10, 17-42. It held that the requested fee was greater than the "market rate." *Id.* at 22. Noting that "[t]he Seventh Circuit has instructed district courts to approximate the market rate that would have prevailed at the outset of the litigation had negotiations between Class Counsel and 'clients having a real stake' been feasible," the District Court considered "(1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar common fund cases where fees were privately negotiated; and (3) information from class-counsel auctions." *Id.* at 22 (citing *In re Trans*

*Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), and *In re Synthroid Mktg.*

*Litig.*, 264 F.3d 712, 719 (7th Cir. 2001)).

The District Court employed a "Modified *Synthroid II* Structure" — 30% of the

first $10 million, 25% of the next $10 million, 20% of the amount between $20 and $45

million, and 15% of the amount above $45 million.  *Id.*  This resulted in an award of

$15,068,265, representing 19.97% of the total fund.  *Id.*

The Court then considered a "risk premium."  *Id.* at 35-39.  It concluded that this

was "riskier than a typical TCPA class action, but only slightly so;" based on data that

"high risk" class actions yield a premium, and reasoning that the here case principally

involved proving liability (as opposed to damages), the Court added 6% to the first tier.

*Id.* at 38.  It awarded $15,668,265 — 20.77% of the total fund.  *Id.* at 39.[5]

Finally, the Court rejected the CCAF Model, holding that it "does not … comport

with the Seventh Circuit's guidance requiring the court to hypothetically approximate

an ex ante fee negotiation," as it "relies exclusively on data relating to cases that were

resolved after Class Counsel filed this case." *Id.* at 39-42.

### Summary of Argument

No Circuit has such clear guidelines governing class action settlements and

attorneys' fees as this Circuit. Few — if any — district courts more rigorously applied

those guidelines than the District Court here.

---

[5] Acknowledging this Court's rule that fees cannot be based off notice and claims
administration amounts, the District Court complied by establishing tiers consistent with
historical benchmarks.  *Id.* at 21, 42.

The Settlement creates a $75,455,098.74 non-reversionary cash fund that will be distributed to 1,378,534 Class members who filed a claim. It requires a second distribution to claimants for uncashed checks before *any* money is distributed *cy pres*.[6] Capital One has implemented protocols governing its use of automatic dialers to call cell-phones that brings it into compliance with *Plaintiffs'* interpretation of the TCPA.

Little wonder that only 14 out of over 16 million Class members objected—most, professional objectors—and only 462 timely opted out.

The Settlement provides excellent relief given a host of risks, any one of which might result in *zero* recovery. Those include 1) a Supreme Court ruling that plaintiffs asserting statutory damages claims lack Article III standing; 2) multiple pending FCC petitions; 3) risk of an adverse ruling on consent and/or class certification; 4) Capital One's use of broad consent language; and 5) the fact that a multi-billion dollar judgment would be at risk of reduction on due process grounds and, in any event, likely not recoverable.

With respect to fees, it is difficult to imagine a more careful analysis than the District Court performed here, nor one based on a more fulsome record. The central flaw with the fee appeal is revealed by a startling admission CCAF counsel made at the fairness hearing: CCAF believes that better and more successful lawyers should command a lower, not higher, market rate. *See* Dkt. 324 (H'rg Tr) at 63:5-8. That remarkable proposition—coupled with a compensation model that requires a court operating *ex post* to review and make judgment calls in every case about the value of

---

[6] The Settlement Administrator projects the actual *cy pres* distribution will be $363,782.74.

time spent and choices made by counsel in that and *all of counsel's other cases* based on a "mind-boggling amount of data"—reveals the CCAF Model to be anything but market-based.

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) disposes of the fee appeal. There, this Court—citing Professor Fitzpatrick —approved a 27.5% fee on a $200 million fund, rejecting the arguments Appellants make here. It reaffirmed the core principle that "[c]ontingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Id.* at 958. The CCAF Model—which more generously compensates *less* competent lawyers and, in effect, awards "competent and energetic counsel" no more than their hourly rate—cannot be reconciled with this principle.

Nothing in Rule 23(h) requires a District Court to intrude upon Class counsel's private market fee allocation. The overwhelming weight of authority holds that allocation decisions are properly left to counsel to resolve absent an allocation dispute. Many factors go into such allocations, not just the *one* Appellants sought to elevate above all others—lodestar. These include case generation, client relationships, particular skills, and the difficulty and nature of tasks undertaken.

Appellants' request that this Court overrule well-settled Circuit fee jurisprudence and adopt instead a model approved by the Supreme Court in an entirely different context is bad law and bad policy. Limiting Class counsel to actual lodestar is anything but a market approach; it is simply setting a "medieval just price" or "Gosplan

. . . price of wheat." *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1020

(7th Cir. 2002); *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568, 569 (7th Cir. 1992).

## Standard of Review

This Court reviews class settlement approval and attorneys' fee awards for abuse

of discretion. *Silverman,* 739 F.3d at 958 (citing *Harman v. Lyphomed, Inc.*, 945 F.2d 969,

973 (7th Cir. 1991)). A fee award should be reversed only "if it cannot be rationally

supported by the record." *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005).

"[I]t is legally correct for a district court to choose either [the lodestar or percentage

method]. Doing so is obviously not an abuse of discretion." *Americana Art China Co. v.*

*Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014).

## Argument

It is difficult to imagine a more rigorous or thoughtful settlement approval and

fee analysis, nor one that more faithfully applies this Court's governing decisions and

guiding principles. If the District Court's ruling here does not pass muster, few can. On

this record, on these facts and law, there is no abuse of discretion, no clear error of law;

indeed, no error at all.

## I.    <u>The District Court Properly Approved the Settlement.</u>

Only two Appellants still challenge settlement approval, as opposed to the

attorneys' fee award. Per this Court's order to avoid unnecessary duplication,

Plaintiffs' adopt many of Capital One's arguments regarding Settlement-only

objections.

### A.    <u>The Settlement Provides Real Relief.</u>

The Settlement creates a $75,455,098.74 non-reversionary cash fund that will be distributed pro rata to 1,378,534 claiming Class members.  This is an excellent result against daunting odds, where, for a host of reasons discussed in Capital One's brief, the Class "faced the real prospect of recovering nothing." *See* Dkt. 329 (Opinion), at 36.

CCAF's mantra that this is a "nuisance value" settlement is wrong.  A nuisance settlement is one a defendant settles to avoid litigation expenses even when it is meritless.  Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 16 n. 7. Defendants' litigation expenses could never approach $75,455,098.74.  *Id.  Murray v. GMAC Mort. Corp.*, 434 F.3d 948, 953-54 (7th Cir. 2006) is off point.  There, this Court reversed class certification denial in a statutory damages case.  Discussing the district court's refusal to certify a settlement class, this Court described a nuisance settlement where the class representative received three times the *maximum* individual recovery while class members—if any bothered to claim for $1—got 1% of the statutory *minimum* and concluded that it "look[ed] like a sellout."  *Id.* at 952.  Just recounting these facts distinguishes *Murray*.  Here, the incentive awards were equal to or below what Plaintiffs could obtain individually, and Class members received real money: almost 1.4 million thought it worth making a claim. Capital One also implemented real practice changes that bring it into compliance with Plaintiffs' reading of the TCPA, changes that benefit *every* Class member.

### B.    There Are No "Red Flags."

This Settlement has none of the defects this Court flagged in recent opinions, as the facts of those cases compared to the Settlement here demonstrates.

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) involved no fixed non-reversionary cash fund: defendants paid only claims made—which at most could amount to $14.2 million if all 4.72 million class members claimed.  In "valuing" the settlement at $20.2 million, the district court added notice costs of $1.5 million, a guaranteed cy pres award of $1.3 million , and awarded fees of $1.93 million to the $14.2 million worth of hypothetical class payments.  *Id.* at 780-81.  Only 30,000 class members (just over 0.6% of the class) made claims—perhaps because doing so required them to fill out a multi-page complex claims form to recover a few dollars—resulting in total class payout of less than a million dollars. *Id.*

*Redman v. Radioshack Corp.*, involved $10 coupons providing little value to class members, only 0.5% of whom submitted claims due to poor notice and the coupons' low value and inconvenience.  *See* 768 F.3d 622, 628, 633-38 (7th Cir. 2014).  In "valuing" the "fund" for fee purposes, the district court included notice and administration costs (*id.* at 630), something the District Court did not do here.  *See* Ex. D (2/15/15 Opinion), at 21, 42.  *Redman* also was plagued by a host of other problems, including that class counsel filed their attorneys' fees motion *after* the objection deadline.  *Id.* at 638-39.

In *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, a TCPA "fax-blasting" case, Plaintiff's counsel requested $2 million in fees, even though the class received less than $400,000, with the remainder reverting.  *See* 743 F.3d 243, 245 (7th Cir.

2014). This Court affirmed the district court's exercise of its discretion to reduce the fees using the lodestar method due to "the paucity of the class recovery." *Id.* at 247.

Finally, *Eubank v. Pella Corp.* involved "every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for." 753 F.3d 718, 728 (7th Cir. 2014)("*Pella II*").

This Settlement shares nothing with the settlements this Court has condemned. Plaintiffs respectfully submit that it — and the District Court's evaluation and approval of it — stands as a positive counter-model.

## C.    Professional Objectors

Plaintiffs recognize that objectors sometimes serve a useful purpose by identifying problems in a settlement. *See Pella II*, 753 F.3d at 720. At times, however, "professional" objectors file objections solely "to extract payments for themselves from the parties or counsel by threatening years of delay associated with unmeritorious settlement objections and appeals: Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements." *Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, *3-4 (D. Mass. Aug. 22, 2006); *see also Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003) (improper to file objection to "cause expensive delay in the hope of getting paid to go away"); Fitzpatrick, The End of Objector Blackmail?, 62 Vand. L. Rev., 1623, 1636. Accordingly, "when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first."

- 18 -

*Dennis v. Kellogg Co.*, No. 09-cv-1786-L (WMc), 2013 U.S. Dist. LEXIS 163118, at *11 n.2 (S.D. Cal. Nov. 14, 2013).

Essentially all of the Appellants here are professional objectors, as even a quick review of the caselaw reveals. Darrell Palmer, Chris Bandas, and Albert Bacharach are all well-known repeat offenders. The CCAF and its founder, Theodore Frank, historically held themselves out to be different—objecting not for personal financial gain but in a good faith attempt to prevent approval of bad settlements and to effect a change in the law. However, in recent filings in this case, Mr. Frank discloses publicly that he has been "moonlight[ing]" for Mr. Bandas, including in cases in this Court (*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)), and has been "retained" by Mr. Palmer in Fifth Circuit appeals. *See* Dkt. No. 60-2 ¶¶ 12, 19-33, 52, 69. In exchange for that work—which apparently includes both hourly and contingent fee work —he has personally been paid some $250,000 by Bandas and Palmer. *See id.* ¶¶ 30-31.

## II.     The District Court Did Not Abuse its Discretion in Awarding Fees of 20.77% of the Non-Reversionary Cash Fund.

In a lengthy and thoughtful opinion analyzing all available facts and law, the District Court awarded Class counsel 20.77% of the non-reversionary cash fund,[7] based upon a tiered fee structure. While the District Court may have *under*compensated Class counsel under this Court's market-based fee jurisprudence and Professor Fitzpatrick's

---

[7] Plaintiffs did not seek—and the District Court did not attempt—to monetize the value of Capital One's practice changes for purposes of their fee request.

analysis,[8] it did not *over*compensate them. To so conclude this Court would have to overrule well-settled controlling Circuit law. This case offers no sound reason for doing so.

## A.     The District Court Applied A Market Approach.

"When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. Courts must "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"). "The market at the time" means *at the start of the case*, not after: the court must "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)." *Id.* That is so because "[t]he best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins." *Id.*

While the District Court had the discretion to choose between the percentage and lodestar method, Professor Fitzpatrick opined that "[t]he percentage method, rather

---

[8] Class counsel elected not to appeal the District Court's award, largely because they believe the Court's award was within its discretion.

than the lodestar[] method[,] best approximates the market for legal services" in cases like this. *See* Dkt. 270 (Fitzpatrick Report), ¶¶ 4, 8. Even using lodestar as a "crosscheck is antithetical to [this Court's] market-based approach." *Id.*, ¶¶ 4, 11. Professor Fitzpatrick cited his comprehensive study of hundreds of cases, including 79 from within the Seventh Circuit, which showed the average fee was 27.4% and the median 29%, with over 40% of all such fees exceeding 30%. *Id.*, ¶¶ 3, 4, 8-14. Based upon his study, he concluded that "rational plaintiffs would have agreed *ex ante* to pay class counsel 30% (or perhaps even more)" and that district courts within this Circuit assessing the *ex ante* market "very often came to the same or even bigger numbers than class counsel have requested here." *Id.*[9]  Professor Fitzpatrick's full study can be found here: Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, 836 (2010); *see also* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 3.

Professor Fitzpatrick's empirical study is consistent with all other evidence of market rates in TCPA cases. Of the 38 class action TCPA settlements approved in the Seventh Circuit in the four years prior to this one, over 55% of them awarded attorneys' fees of 33% of the common fund (or more). *See* Dkt. 302 (Resp. Br.), at 9; *see also* Dkt. 329 (Opinion), at 26-28; Dkt. 330 (Settlement Data Order). The median award in these same cases in the Seventh Circuit was 29.5%. *See* Dkt. 302 (Resp. Br.) at 9.

---

[9] Professor Fitzpatrick also concluded that the fees in TCPA cases should be higher than other cases given that TCPA claims involve hard-to-quantify "actual" damages—only statutory damages—such that the primary interest of the Class is deterrence, not compensation. Higher fee percentages incentivize counsel to bring cases and maximize deterrence. Dkt. 270 (Fitzpatrick Report), ¶¶ 13-14.

Appellants' argument that relying on other court decisions to assess the market rate is somehow improper is silly. As Professor Fitzpatrick notes, it assumes that all of those courts failed to follow the law in reaching their conclusions—an assumption made without *any* basis. And while Appellants criticized the District Court for synthesizing fee awards in out-of-Circuit TCPA cases, Appellants themselves relied on out-of-Circuit cases. *See* Dkt. 293 (Collins Br.), at 3, 8, 11.

This Court recently held that "in consumer class actions, where the percentage of class members who file claims is often quite low . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014). This fee is well below that ceiling in a case with comparatively robust claims numbers.

The argument that TCPA cases are *less* risky than other cases is wrong. By comparison, many securities and antitrust cases—including the one Appellants cited below as "riskier"—follow governmental investigations or public disclosures, if not criminal complaints and convictions. *See, e.g., In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 72 (S.D.N.Y. 2000). And while this case did not involve significant arbitration risk, it did involve particularly strong consent language, as discussed in Capital One's brief, as well as significant risk from pending FCC petitions. As Professor Rosenberg concluded, "[i]n reality, the process for prosecuting a class action renders such litigation an extremely risky venture." *See* Dkt. 302-3 (Rosenberg Supp. Report), ¶¶ 11-13 (describing risks in TCPA class litigation).

CCAF made much of the fact that across the TCPA cases subject to discovery, Class counsel expended less lodestar in cases they lost than cases they won. But that proves nothing. It would be shocking if Class counsel expended *more* lodestar in cases *lost* on early motions (e.g. to dismiss or compel arbitration) than those they litigated over years through settlement. And Class counsel have heavily litigated TCPA cases—up to the eve of trial—and then lost. As just one example, two Class counsel firms received no fees after having class certification denied 11 days before trial. *See Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 530 (E.D. Wis. 2014); *see also Warnick v. Dish Network LLC*, 301 F.R.D. 551 (D. Co. 2014) (denying class certification after significant expert work and discovery).

That Class counsel somehow know how to "pick a winner"—or engage in improper padding of their hours—is baseless speculation, and also reflects a lack of understanding of TCPA litigation. Class counsel would need to be Carnac the Magnificent to know in advance which TCPA cases would be "winners" and which would be "losers."

Also relevant are the retainers between Plaintiffs and Class counsel. All but two provide fees of 33.33% to 40% of any common fund they obtain (the others do not specify a percentage). *See* Dkt. 176 (Class Counsel Fee Brief), at 9; Dkt. 177-2 (Burke Decl.), ¶ 14; Dkt. 302-1 (Selbin Supp. Decl.), ¶ 4.

While expressly conceding that the District Court did not abuse its discretion by not taking competitive fee bids at the start of the litigation, Appellants argue that this Court should establish a bright line rule that courts must take competitive bids at the

outset "when there is a sizable class action with large stakes."  CCAF App. Br., at 32 n.

10.  But that, too, requires a level of prescience about "the stakes" of a case rarely

possible at the outset.  No Circuit requires such bidding, whatever the stakes.

> ### B.    The CCAF Model is An Entirely *Ex Post* Central Planning Model With Predictably Perverse Incentives and Outcomes.

In the face of this Court's mandate that district courts employ a market-based

analysis that attempts to recreate the *ex ante* fee, CCAF proffered a purely *ex post* model

that is the complete antithesis of *ex ante* market analysis. As Professor Fitzpatrick

concludes, the CCAF Model "relies on assumptions that are both unsupported and

implausible as well as data that is inapposite," and, in his opinion, its "conclusions are

inconsistent with the Seventh Circuit's *ex ante* market approach."  Dkt. 302-2

(Fitzpatrick Supp. Report), ¶ 5. "[B]y design" the CCAF Model achieves its end only by

"disregarding the *ex ante* market approach for calculating the fee, disregarding the rules,

procedures, and practice of class action litigation, and adopting arbitrary, unrealistic

assumptions."  Dkt. 302-3 (Rosenberg Supp. Report), ¶ 7.

> ### 1.    The CCAF Model Assesses Fees Across Unrelated Cases.

The CCAF Model presupposes that it is proper in assessing the proper fee in *this*

case to evaluate the entire book of Class counsel's TCPA business across *different* cases

over many years, and try to ensure that their return across all such cases meets some

predetermined "just price."  Class counsel are unaware of any authority for that

proposition.

There are two obvious flaws.  First, rather than looking at Class counsel's results in *this* case, it seeks to create some overall return on investment across wholly unrelated cases involving different facts, different jurisprudence, different law firms and different outcomes.  Second, as Professor Fitzpatrick notes, it is the central planner model "on steroids;" it:

> requires a mindboggling amount of data—and an equally mindboggling amount of time and effort by courts to collect and analyze it. In every class action case, not only would the court need to know the wins, losses, and profits and losses of all of class counsel's other related cases, but the court would have to try to figure out how much of a premium plaintiffs' lawyers would demand over the certain hourly fees of defense lawyers (the elusive "e" factor) to take on a particular case. I do not know how a court would even begin to calculate this "e" factor. Moreover, the court would have to pour over all of this data and do all of this math in every case because the wins, losses, and profits and losses will change over time.

Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 14.

### 2.     The CCAF Model Relies Solely Upon *Ex Post* Information.

CCAF relied exclusively on information that was not known (or even knowable) at inception.  That is true in two respects.

First, CCAF relied solely upon fees awarded in TCPA cases not resolved until *after* the filing of the first of these cases in August 2011.  *See* Dkt. 302 (Resp. Br.), at 3 n. 3. There was no track record of successful TCPA class settlements for automated calls to cell-phones when this case started, let alone one involving such strong contractual consent language.  When *Alarcon* was filed, neither counsel there had been awarded fees in any TCPA class action; they had only lost time and money.  Dkt. 302-1 (Selbin Supp. Decl.), ¶ 2.  Similarly, when Capital One was added to *Mack* in January 2012, counsel there had secured final approval for only a single TCPA class action.  Dkt. 302-4

(Burke Decl.), ¶ 3.  There was never any assurance that Class counsel would receive *any*, much less "substantial," compensation in this or any other TCPA case.

Second, CCAF made the remarkable assumption that Class counsel had precise, accurate information about every aspect of how *this* litigation would turn out before it even began—including the number of class members, the final settlement amount, and the precise amount of lodestar it would take to achieve settlement.  *See* Dkt. 294 (Henderson Report), at 10 (¶ 20).  That is not *ex ante* analysis; it is *ex post* analysis based upon 20/20 hindsight. Beyond the general things not knowable at the outset of any litigation—such as whether defendants would litigate aggressively, or for how long, and what the court might do with respect to substantive (i.e. motion to dismiss and summary judgment) and procedural (i.e. class) rulings—here Class counsel could not know how many Class members there were, or the nature and scope of any defenses Defendants might assert.  A primary battle in TCPA class cases involves attempts to determine the size and scope of the class.  Those are *never* known by Class counsel *ex ante*, and typically require dogged discovery and litigation to obtain, as it did in this case.  *Patterson v. Capital Management Services, L.P.*, Case 1:12-cv-01061 (N.D. Ill.), Dkt. Nos. 43, 55.  TCPA class plaintiffs sometimes lose that issue.  *See, e.g. Gusman v. Comcast Corp.*, 298 F.R.D. 592, 596-97 (S.D. Cal. 2014); *Brown v. DIRECTV, LLC*, 13-cv-1170, Dkt. 196 (C.D. Cal. Dec. 10, 2014).

The CCAF Model ignores the fact that Class counsel face significant regulatory risks that threaten to upend many TCPA cases.  Indeed, Class counsel have had TCPA actions stayed by courts pending various FCC petitions.  *See, e.g., Id.*, Dkt. 198 (C.D. Cal.

Dec. 11, 2014).  Although it now appears that the FCC may rule favorably for

consumers, it previously appeared it might gut the TCPA.  *See* Michael O'Rielly, FCC

Commissioner, TCPA: It is Time to Provide Clarity, FCC Blog (Mar. 25, 2014) (available

at http://www.fcc.gov/blog/tcpa-it-time-provide-clarity).  Class counsel cannot

predict what FCC petitions will be filed or how or when the FCC may rule, creating a

constant threat to any TCPA action.

The CCAF Model ignores risk from adverse changes in jurisprudence.  There

was—and is—very real risk that the Supreme Court will hold that plaintiffs asserting

pure statutory damages claims like those under the TCPA lack Article III

standing.  While that risk was, at the time of final approval, unnamed, it now bears a

name: *Spokeo, Inc. v. Robins*, 742 F.3d 409 (9th Cir. 2014), *cert granted*, 83 U.S.L.W. 3819

(U.S. Apr. 27, 2015) (No. 13-1339).

The CCAF Model also ignores the truism that "[s]ometimes cases get riskier over

time—even after class certification—and class counsel have ethical and fiduciary

obligations to see a case through even when things take a turn for the worse; they

cannot just pack up their bags and go home because the initial investments did not pan

out as hoped."  Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 12; *see also* Dkt. 302-3

(Rosenberg Supp. Report), ¶¶ 12-13.

### 3.    The CCAF Model Is Bad Economic Theory that Contravenes the Actual *Ex Ante* Legal Market and Measures Only Lodestar.

The CCAF Model is driven—if not entirely limited by—lodestar.  Or, as

Professor Rosenberg put it, it is "essentially the lodestar method, masked in business

school lingo to obscure its arbitrary assumptions and rejection of the *ex ante* market

approach for class action fee awards."  Dkt. 302-3 (Rosenberg Supp. Report), ¶ 1.

Professor Fitzpatrick agreed:  "it is clear that [Appellants] actually ask the Court to

apply the lodestar method instead: they argue that the percentage the Court should

award is the one that equals class counsel's lodestar enhanced by risk multiplier."  Dkt.

302-2 (Fitzpatrick Supp. Report), ¶ 6.

Why?

Appellants propose the following model—developed by Professor Henderson—

of *ex ante* negotiations:

$$Q * E(R) | S = 1/p * E(L) | S * e$$

Although the equation seems complicated, it is straightforward:  a plaintiffs' lawyer's

compensation should equal the product of case-specific risk [1/p], investment expected

to be necessary to achieve settlement [E(L)|S], and [e], "a risk premium to compensate

for variance in outcomes and the risk of the winners' curse."[10]  Dkt. 294 (Henderson

Report), at 32 (¶ 65).

As an initial matter, this model does not consider many of the factors Appellants

claim it does.  Below, CCAF argued that the "Henderson model would produce an even

higher multiplier" if the class size or per-class-member recovery were different.  CCAF

---

[10] The CCAF Model assumes, by mentioning the need to avoid the "winner's curse," that an auction for legal services would have been a "common values" auction.  But that is precisely wrong, and highlights the degree to which Henderson misunderstands the relevant market. Class action lawyers are not fungible widgets, as this Court knows well.  The value of the asset—that is, the value of this case—greatly depends on who "the winner" is.  The value of the asset depends in part on how good the lawyers are who "win" the "auction" and actually prosecute the case.

App. Br., at 8-9. This is *impossible* because neither class size nor per-class-member recovery are factors in the Model.

The Model does include three concepts important to a plaintiffs' lawyer: litigation risk, investment, and overall uncertainty about the prediction—one might call this information risk. However, the analysis is flawed because it makes no attempt to value litigation risk or investment on an *ex ante* basis—which would involve asking what the parties would have expected and demanded at the outset of the case before making any investments. Rather, it simply uses the *actual litigation outcomes in this case* to generate estimates of litigation risk and investment. Dkt. 294 (Henderson Report), at 10 (¶ 20) (basing the "*ex ante*" conclusion on purely *ex post* factors—actual settlement amount and actual lodestar incurred). However, "[i]n reality, the process for prosecuting a class action renders such litigation an extremely risky venture." Dkt. 302-3 (Rosenberg Supp. Report), ¶¶ 11-13.

In theory, the Model could compensate for this by discounting those probabilities for information risk using "e". This makes "e" the only *potential* variable left to account for this Court's requirement of an *ex ante* estimation of value.[11] However, the Model makes no empirical analysis of "e" whatsoever, instead it just "simplif[ies] the analysis by assuming…a risk premium that is approximately one." Dkt. 294 (Henderson Report), at 35 (¶ 71).

---

[11] As Henderson put it below, "In fact, the lawyers would likely demand more than this amount to account for the variance and risky nature of the investment. This is captured by the risk premium term, e, in the above equation." Dkt. 294 (Henderson Report), at 33 (¶ 68.)

But setting the value of "e" to 1 drops "e" out of the equation altogether.  It is the mathematical equivalent of assuming *no* risk premium, and it is the economic equivalent of assuming that hypothetical *ex ante* bargainers have perfect information about risk and investment.  This leaves Appellants with an equation that calculates fees as a function of *ex post* litigation success and *ex post* information about investment.  This does not qualify as a serious attempt to implement an *ex ante* approach; it is the exact opposite.[12]  As Professor Fitzpatrick explains, this assumption is based on unsupported assertions that are simply "not plausible."  Dkt. 302-2  (Fitzpatrick Supp. Report), ¶¶ 9-12; *see also* Dkt. 302-3 (Rosenberg Supp. Report), ¶¶ 10-13.

Rather than estimating *ex ante* values, the CCAF Model simply delivers the *ex post* result Appellants desire:  a "return equivalent to the defense lawyers in these cases." Dkt. 294 (Henderson Report), at 40 (¶ 78.)  After "simplifying" the equation by removing any risk premium, the model is:

> (contingent fee percentage) X (recovery) = (1/p) X (anticipated lodestar to settlement), where "p" is the probability that an invested dollar is recouped.

However, when it comes time to execute, the model is not driven by an *ex ante* evaluation of probabilities or investment, as promised.  Rather, it *assumes* that the left side of the equation should be total lodestar—i.e., the $15.4 million in all their TCPA cases reported by Class counsel in their discovery responses.

Total Lodestar = (1/p) X (anticipated lodestar to settlement)

---

[12] It also violates decades of economic theory about the importance of accounting for information problems in modeling rational actor behavior.  *See* Joseph E. Stiglitz, Information and the Change in the Paradigm of Economics, Part I, The American Economist 8 (Spring 2004).

(¶ 78.)  This *assumes* Class counsel should be put in the same position as defense lawyers without accounting for *any* of the differences in a contingent-fee practice.  *Compare id. with* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶¶ 9-12.

Next, the Model assumes that Class counsel knew *ex ante* that the lodestar required to obtain settlement was the actual lodestar they ultimately invested in cases that *did* settle: $9.8 million.  This is a fundamental conceptual error.  The Model is now:

Total Lodestar = (1/p) X (Lodestar in Successful Cases)

That is not a model—it is a tautology.  It starts from the premise that the total fee on all TCPA cases should equal *the total lodestar* and *then* calculates the multiplier that, if applied to the successful cases, would achieve that result.

Appellants' "Real Option" framework fares no better.  It borrows a framework for discounted cash flow analysis that incorporates the concept that managers can dynamically respond to changes in information over time.  Henderson cites a law review article by Grundfest & Huang explaining how this could be used to *ex ante* value a litigation claim.  He presents what he describes as:

> Their equation for estimating the appropriate risk multiplier to determine the suitable compensation for class counsel […]:

$$M^{**} = (D + p*T) / p * (D + T)$$

Dkt. 294 (Henderson Report), at 44 (¶ 85).  Suggesting that some kind of empirical or statistical analysis has occurred, he refers to this equation as a "robustness" check of his "result" of a 1.57 multiplier.  (*Id.*)  This statement is false.

First, it is not a "robustness check" on the CCAF Model. To the contrary, Grundfest & Huang themselves allow that "Substantial scholarship supports the proposition that uncertainty is rife in the litigation process[,]"[13] and may be so problematic that it is pointless to try to model litigation behavior micro-economically—the "impossibility conjecture."[14]

Second, to the extent Henderson suggests his "robustness" check is something different than his "model," this is untrue—they are exactly the same math equation, just expressed differently. *See* Dkt. 301-1 (12/16/14 Selbin Supp. Decl.), ¶ 8. It is thus no surprise that the "check" produces exactly the result as the "model." Both are simply algebraic representations of a pre-selected result that is purely lodestar-driven.

## 4. The CCAF Model Creates Perverse Incentives and Outcomes.

The perverse nature of the CCAF Model is perhaps nowhere more evidenced than by CCAF counsel's admission at the fairness hearing: "they're saying that under the [CCAF] model, lawyers that are not as successful or lawyers that are not as competent or what not are getting paid more. That's actually correct. They're not wrong." *See* Dkt. 324 (H'rg Tr) at 63:5-8. In other words, better lawyers should be compensated *less* than worse lawyers. That's not a bug CCAF tries to hide—they tout it as a feature. It is a central premise of their Model that Class counsel should receive less compensation here because they were successful in other TCPA cases. Under this approach, if Class counsel had lost more cases, they would be awarded a higher fee in

---

[13] Joseph A. Grundfest and Peter H. Huang, "The Unexpected Value of Litigation: A Real Options Perspective," 58 STAN. L. REV. 1267 (2006), 1320, n. 140.

[14] *Id.* at 1321.

this case.  Indeed, if Class counsel had won only ten percent of their cases, the CCAF

Model would support awarding them attorneys' fees of 30%.  *See* Dkt. 294 (Henderson

Report), 27 (¶56). In other words, the CCAF Model –- by design –- compensates the

least successful attorneys the most and the most successful the least.

Simply stating the proposition reveals its flaw: in exactly *zero* free markets do

better and more successful skilled [fill in the blanks] command a *lower* price than worse

and less successful ones.  Of course, it may well be that just as a central planner could

arrive at a "medieval just price" or a "Gosplan . . . price of wheat," a district court could

employ an *ex post* analysis to determine and set a price for lawyering that effects such

an absurd result.[15]  But that is not what this Court's jurisprudence requires, nor does it

make for good policy.

Appellants' argument that this is "low merit *in terrorem* litigation" that "should

be discouraged" is also wrong.  CCAF App. Br. at 40.  In *Mims v. Arrow Financial

Services, LLC*, the Supreme Court recognized that consumer privacy complaints about

telephone technology abuses had prompted Congress to pass the Telephone Consumer

Protection Act of 1991, 47 U.S.C. § 227 *et seq.*  *See* 132 S. Ct. 740, 744 (2012).  In fact, these

complaints continue: in 2014 alone the FCC received over 215,000 TCPA complaints.

*See* FCC Fact Sheet on Consumer Protection Proposal, available at

https://www.fcc.gov/document/fact-sheet-consumer-protection-proposal. Congress

enacted the TCPA, and provided statutory damages precisely to encourage litigation to

---

[15] *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d at 1020; *In re Continental*, 962 F.2d at 568; *see also* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 14.

enforce its objectives. Awarding fees based on a percentage of the fund recognizes the deterrent value of such cases and incentivizes counsel to undertake such cases. *See* Dkt. 271 (Rosenberg Report), at 3-5; Dkt. 302-2 (Fitzpatrick Supp. Report), ¶¶ 11-12 & n. 6.

Finally, Appellants' argument that it necessarily benefits the class to require attorneys to "compete" for lead counsel on fees is incorrect, irrelevant here, and not a widely-accepted proposition. If accepted, the CCAF Model would *harm* class members by incentivizing the worst lawyers to file class cases and discouraging the best lawyers from pursuing them. It is also irrelevant because no auction was held here, and it is not possible to hold one now. The District Court did, however, consider the case CCAF cited—*In Re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943 (N.D. Ill. 2001)—and other cases involving auctions, and, consistent with this Court's opinions in *Synthroid I and Synthroid II*, reduced the overall percentage from the norm to reflect that cases decided without an auction typically produce higher percentage fees. Dkt. 329 (Opinion), at 28-33. Finally, as this Court has noted, "auctions do not work well unless a standard unit of quality can be defined and its delivery verified" and "[t]here is no 'standard quality' of legal services, and verification is difficult if not impossible." *Silverman*, 739 F.3d at 958.

### 5.    No Case Supports the CCAF Model.

Unsurprisingly, this Court has never adopted anything like the CCAF Model. The primary case Appellants cite—*In re Continental Illinois Sec. Litig.*, 962 F.2d at 569 — stands for the opposite proposition. In *Continental*, plaintiffs' counsel requested fees on a lodestar basis. *Id.* at 568. Using that method, the district court reduced the requested

fee by half. *Id.* at 568-69. This Court held it was error to refuse to apply a risk multiplier: "the failure to make any provision for risk of loss may result in systematic undercompensation of plaintiffs' counsel in a class action case, where as we have said the only fee that counsel can obtain is, in the nature of the case, a contingent one." *Id.* It is in the lodestar-multiplier context that *Continental* then posed the hypothetical, cited by Appellants, on how to apply a risk multiplier *to a lodestar-based request. Id.* It has no application here.

> *Continental* admonished against straying from the market approach:
>
> It is apparent what the district judge's mistake was. He thought he knew the value of the class lawyers' legal services better than the market did. . . . He may have been right in some ethical or philosophical sense of "value" but it is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.

*Id.* at 568-69. Yet that is precisely what CCAF argued here: that courts should award "the equivalent of the medieval just price" rather than what the market would pay.

*Continental* also expressly rejects CCAF's implicit contention that Class counsel should receive only lodestar. As this Court characterized it in *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994), *Continental* held that "a risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel 'had no sure source of compensation for their services.'" (quoting *Continental*, 962 F.2d at 569). As *Continental* held, "the need for such an adjustment is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." 962 F.2d at 569.

- 35 -

*Continental* also emphasized that even in the context of a relatively low-risk case there is always the risk of little or no recovery. As this Court wrote: that "defendants doubtless would have been willing to pay *something* to get the case off their backs does not imply that class counsel were certain to obtain a settlement entitling them to a fee commensurate with their efforts. They could have lost everything . . . ." *Id.* at 569-70 (emphasis in original).

Appellants cite this Court's decision in *Silverman*, but bury the lede: *Silverman* approved an award of 27.5% of a $200 million common fund. While stating that such an award was "exceptionally high" for such a large fund, this Court held it is not "legally excessive." *Id.* at 958. Notably, discussing what a more reasonable award there might be, the Court used "one averaging 20%" as an example. *Id.* at 959. The fee here—on a smaller fund of $75.45 million—is 20.77%. *Silverman* also rejected the notion—fundamental to Appellants' argument yet now disclaimed by them—that lawyers are essentially fungible, such that an auction based solely on price is meaningful, and "that fee schedules set *ex ante* are the *only* lawful means to compensate class counsel in common-fund cases." *Id.* at 957-58 (emphasis in original). It also rejected the contention that the absolute amount of the fees or the hourly rate is somehow the core issue: "Our concern is less with the absolute level of fees than with the structure of the award." *Id.* at 959. The Court then cited as an example of an appropriate structure precisely what the District Court did here: a fee "that increases at a decreasing rate." *Id.* (discussing *Synthroid II*, where the award was "30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 to $46 million, and 15% of everything else."). Finally,

*Silverman* restates a core principle entirely inconsistent with the CCAF Model:

"Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk

of walking away empty-handed, the higher the award must be to attract competent and

energetic counsel." *Id.*

CCAF's attempt to distinguish *Silverman* fails. While true that only one firm

sought lead in that case, it is also true, as the District Court noted, Dkt. 329 (Opinion), at

17-18, that only a handful of firms—including all those in this case—have litigated most

of the big TCPA cases. So, if "[l]ack of competition not only implies a higher fee but

also suggests that most members of the securities bar saw this litigation as too risky for

their practices" warrants a higher than normal fee there, it applies with almost as much

force here, and supports this fee. *Id.* at 958. Nor does the fact that counsel in *Silverman*

expended more costs and litigated longer somehow distinguish the cases in relevant

respects. That is both because Class counsel here actually litigated this case hard over

several years—it did not "settle quickly"—and because the fee award here is

substantially lower (20.77% vs. 27.5%) than in *Silverman*.

### 6.    Heads CCAF Wins, Tails Class Counsel Lose.

Despite CCAF's advocacy here that the District Court should have employed

(what is in essence) the lodestar approach, it has consistently—and with some success—

argued precisely the opposite. In case after case CCAF has advocated that class counsel

be paid a percentage of the money actually paid to the class, *not* based upon the lodestar

expended to obtain that relief. *See, e.g., Poertner v. The Gillette Co.*, 6:12-cv-00803-GAP-

DAB (M.D. Fla. Feb. 27, 2014), Dkt. 126 (Theodore H. Frank Objection to Class

Settlement) at 31 ("As an 'interest-alignment device,' a contingency approach like the percentage-of-recovery method 'is not perfect…. But [an] imperfect alignment of interests is better than a conflict of interests, which hourly fees may create.'" (quoting *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir.1986)); *In re Southwest Airlines Voucher Litig.,* 11-CV-8176 (N.D. Ill. Apr. 10, 2013), Dkt. 105 (Objection to Proposed Settlement and Attorneys' Fees) at 10; *see also In re: Baby Products Antitrust Litig.,* Nos. 12-1165(L), 12-1166, 12-1167, (3d Cir. Apr. 24, 2012), Dkt. 35 (Brief of Objector-Appellant Kevin Young) at 41; *In re Google Referrer Header Privacy Litig.,* 5:10-cv-04809 (N.D. Cal. Aug. 8, 2014), Dkt. 70 (Objection of Melissa Holyoak and Theodore H. Frank) at 16; *Fraley v. Facebook, Inc.,* CV-11-01726 RS (N.D. Cal. May 2, 2013), Dkt. 310 (Objection to Proposed Settlement and Fee Request) at 6; *In re EasySaver Rewards Litig.,* 3:09-cv-2094-AJB (S.D. Cal. Dec. 07, 2012), Dkt. 258 (Objection to Proposed Settlement and Notice of Intent to Appeal) at 15; *Brazil v. Dell, Inc.,* C 07-01700 RMW (N.D. Cal. Sept. 27, 2011), Dkt. 322 (Objection to Proposed Settlement) at 15; *In re HP Inkjet Printer Litig.,* C-05-3580 JF (N.D. Cal. Dec. 30, 2010), Dkt. 263 (Objection to Proposed Settlement) at 15.

Yet, here, where a percentage of the Class recovery is what Class counsel sought and the District Court awarded, CCAF argued instead that anything more than lodestar (with a small multiplier) is a windfall.

### C.  The District Court Properly Declined to Intrude Upon Private Market Fee Allocation.

Appellants' argument that the District Court should have reviewed and approved the internal fee allocation among Class counsel is not supported by any authority and only evinces their goal of imposing a central planner, not a market, model.

#### 1.  No Authority Requires Courts to Evaluate Fee Allocation Agreements.

There is *no* authority requiring courts to intrude into the private market ordering and fee arrangements of Class counsel. The plain language of Rule 23(h) says no such thing, and has never been interpreted that way. The Advisory Committee notes make clear it is purely discretionary, not mandatory. It provides that "*[i]f directed by the court, the [fee] motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made,*" and notes that the rationale is that "'Side agreements' regarding fees provide at least perspective pertinent to an appropriate fee award."  Rule 23(h), Notes of Advisory Committee on 2003 amendments, Note to Subdivision (h)(emphasis supplied).

Even that discretionary language is made specifically in the context of discussing "agreements *among the parties* regarding the fee motion, and . . . agreements *between class counsel and others* about the fees claimed by the motion."  *Id.* (emphasis supplied). *Nothing* suggests it applies to private fee allocation agreements *among* class counsel: the Notes speak of "agreements among the parties"—i.e. class counsel and the defendants, which is obviously important and deserving of court review—and "between class

counsel and others"—it is unclear who such others might be, but if fees are to be shared

outside class counsel, that, too, would obviously be deserving of court scrutiny.

The caselaw does not hold otherwise. In *Mercury Interactive Corp. Sec. Litig.*, the

Ninth Circuit noted that courts act as fiduciary for the class when awarding attorneys'

fees; it said *nothing* about courts wading into allocation of fees among counsel. 618 F.3d

988, 993-94 (9th Cir. 2010). Nothing in *Mercury Interactive* holds that "the notice must

enable them [the class] to determine which attorneys seek what fees for what work," the

proposition for which CCAF creatively cites it. CCAF App. Br., at 42. Its focus was on

the difficulty class members have in assessing the reasonableness of a fee request absent

more information than just the lump-sum number. To address that problem, the Ninth

Circuit established procedural safeguards to ensure class members have access to

detailed information, and sufficiently in advance of the objection deadline to permit

them to meaningfully evaluate it. *Mercury Interactive Corp. Sec. Litig.*, 618 F.3d at 994.

All those safeguards were in place here.

Nor does *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir.

2008) support CCAF. The only reason the Fifth Circuit waded into the issue was due to

a fee allocation dispute among counsel. CCAF argued that "there is no reason to treat

*High Sulfur* as applying only to inter-attorney disputes," CCAF App. Br., at 43, but that

is precisely the distinction the Fifth Circuit drew: "[i]t is one thing for all attorneys to

come to an agreement about dividing up fees, and quite another for five attorneys to

declare how an award will cover themselves and seventy-four other attorneys with no

meaningful judicial supervision or review." *High Sulfur*, 517 F.3d at 234. There is no

allocation dispute here requiring resolution.  Also of importance to the holding is the fact that the Fifth Circuit requires fee awards—even in common fund cases—to be based upon lodestar rather than a percentage of the common fund.  *Id.* at 228.  As a result, any private fee allocation that alters a lodestar-based allocation would fundamentally alter the basis for the award.

For the first time on appeal, CCAF cites to a pre-Rule 23(h) case, *In re "Agent Orange" Prods. Liab. Litig.*, 818 F.2d 216 (2d Cir. 1987), for the proposition that the court must approve *all* fee allocation agreements. That is wrong.  As an initial matter, *Agent Orange*, like *High Sulfur*, came to the court on an allocation dispute among class counsel.

*Agent Orange* is also readily distinguishable, both on the unique facts and controlling law that drove its holding.  First, controlling law in that Circuit required that fees *must* be calculated using the lodestar-multiplier method.  Second, the allocation agreement allocated fees on a "return-on-investment" basis that looked *not* to the lodestar (i.e. work performed) but the costs advanced.  *Id.* at 223.  In other words, certain firms—"investors"—advanced costs with a guaranteed return on that "investment" regardless of who did the work.  Those "investors" received an up-front threefold return before any fees were apportioned; as a result, the district court's own fee allocation was fundamentally altered. *Id.* at 218-20.  The Second Circuit reached its conclusions based upon that controlling law, applied to that particular fee sharing agreement, where the district court actually allocated the fees one way and the private agreement fundamentally altered that allocation.  It held that "it is beyond doubt that the agreement, by tying the fee to be received by individual PMC members to the

amounts each advanced for expenses, completely distorted the lodestar approach to fee awards," and expressed concern that such agreements can create a conflict of interest to the detriment of the class. *Id.* at 222-24. In particular, it noted that such an agreement incentivizes counsel "to accept an early settlement offer not in the best interests of the class, because an attorney who is promised a multiple of funds advanced will receive the same return whether the case is settled today or five years from now." *Id.* at 224 (quotation omitted). It therefore concluded that the fee sharing agreement *in that case* "violates the principles for awarding fees in an equitable fund action and places class counsel in a position potentially in conflict with the interests of the class which they represent," and thus was not enforceable. *Id.* at 226.

Neither the law nor the facts are similar here, making the Second Circuit's desire at that time to tether fee allocation to lodestar irrelevant for two independently dispositive reasons. First, in this Circuit, a district court has discretion to award fees as a percentage of a common fund. Which means the incentives remain properly aligned because Class counsel—all of them, regardless of the ultimate allocation—fare better on a larger total fund. There is no conflict of interest because the better the class does, the better the lawyers—all of them—do. Second, while the record below is silent on this issue (because CCAF did not cite *Agent Orange* or raise the issue of whether there was a return-on-investment agreement here), counsel can represent to this Court that there is no "return on investment" agreement here. The only agreement with respect to costs is the typical one—costs are reimbursed dollar for dollar out of the fee award, followed by distribution of the agreed-upon fee allocation.

Against the absence of authority supporting CCAF, there is ample authority that fee allocation among class counsel generally is, and should be, a matter of private agreement. As Judge Ambro noted in a concurrence in *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 168 (3d Cir. 2005),[16] there is an "emerging consensus (or, at least, trend) that it is difficult for courts to assess the contribution of various counsel to the litigation," as a result of which courts routinely delegate the allocation to lead counsel, particularly—as here—where no firm objects to the allocation and puts the dispute before the court. *Id.* at 168-69.

Judge Ambro was right: courts routinely hold that fee allocation in class cases is "a private matter for the attorneys to resolve." *See e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 8:10ML 02151, 2013 U.S. Dist. LEXIS 123298, at *316 (C.D. Cal. July 24, 2013).

CCAF urges this Court to be the first to adopt a new rule mandating court supervision of private fee allocation agreements in all circumstances. Because such a rule is not the law, the District Court could not abuse its discretion by not requiring Class counsel to submit their agreed-upon allocation for review.

### 2. Appellants' Proposed Rule is Bad Policy.

A rule that courts must always review and approve private allocation agreements is, again, an attempt to impose a central planner model on what should be a market system. This approach would require the court to gather and evaluate reams of

---

[16] It is a concurrence because the majority concluded there was no jurisdiction.

data regarding which counsel performed which tasks and with what prior experience and current skill level.

In addition to the extra effort required for a court to wade into the minutiae of fee allocation, such a rule would replace the *ex ante* operation of the private market, in which counsel agree upon an allocation at the outset, with a court's *ex post* assessment of fairness. Setting aside that this once again is contrary to this Court's command that the analysis attempt to recreate the conditions *ex ante*, it also seeks to substitute a court's judgment for that of the actual market players. And, based on Appellants' view, the overriding—if not sole—factor in such an analysis is lodestar. But the private market frequently does not value contributions to a case based solely (or even mostly) on lodestar. Case ideas, client relationships, reputation, expertise in particular substantive or procedural matters, and key work (including staffing certain depositions, written and oral arguments, and trial) all matter in the private market. Simply put, all hours—and thus all lodestar—are *not* equal. The firms in this case arrived at their own privately negotiated allocation that accounts for those factors. Absent circumstances suggesting something improper as in *Agent Orange*—and there are none here—or counsel who are parties to the allocation agreement *seeking* court interpretation or supervision of the agreement—also not present here—there is no reason for the courts to wrest control of a private agreement that has no bearing on the Class and impose its own after-the-fact view of the proper arrangement.

### 3.    There is No Price Fixing.

Appellants make vague and speculative arguments regarding purported price-fixing and even possible antitrust violations.  As an initial matter, this allegation, even if true—and it is not—would have zero impact on the benefits received by the Class.  That is, whether the court-awarded fee is allocated one way or another among the six firms does not reduce the fees paid by the Class one dime—the same fee would be awarded. The District Court noted this fact at the fairness hearing:

> THE COURT: Well, maybe I didn't articulate it appropriately. There's a certain amount of work that has to be done to prosecute a class action.
>
> MS. HOLYOAK: Sure.
>
> THE COURT: And from looking at the figures that I ordered the plaintiffs' counsel to provide with regard to their hours and that sort of stuff, it seems to me there was a division of labor that was taken up. There wasn't a lot of duplication.

Dkt. 324 (H'rg Tr) at 50:12-20.  In other words, whether there were six firms or one, the *same work* was required, and the District Court satisfied itself that the work was handled efficiently. *Id.*  Class counsel's fee declarations detailed their efforts in this regard.  *See* Dkt. 177 (9/29/14 Selbin Fee Decl.).  And, as Professor Rosenberg noted, "[l]odestar encourages duplication of effort; percentage always militates against any waste.".  *See* Dkt. 302-3 (Rosenberg Supp. Report), ¶ 6.

With *no* factual basis, CCAF *speculated* that there *must* be improper price-fixing. That despite the undisputed record that separate firms filed competing cases that were centralized by the JPML on a motion by Capital One *opposed* by *all* Plaintiffs.  *See* Dkt. 1 (12/10/12 JPML Transfer Order), at 1.  Nor is there any truth to the claim that Lieff

Cabraser was appointed co-lead counsel without a client, as the record below shows. Lieff Cabraser represented Plaintiff Alarcon, who filed in the Northern District of California. For strategic reasons, she dismissed that case and sought to join the *Amadeck* action. *See* Dkt. 263 (11/18/14 Selbin Final Approval Decl.) ¶ 10. When the MDL was created and a master complaint filed, Alarcon—who always was to be a plaintiff and class representative—was added back in and appointed as such by the District Court. *See* Dkt. 19 (Complaint), ¶¶ 10, 35-37; Dkt. 137 (Preliminary Approval Order), ¶ 7.

Nor is there anything nefarious about what Class counsel did once the MDL was created. They met and conferred to ascertain the best and most efficient way to organize themselves. This private ordering resulted in agreement on a proposed leadership structure: two co-lead firms and a liaison firm. That structure was submitted to the District Court by way of a properly noticed Rule 23(g) motion, supported by a fulsome record, which the District Court granted. *See* Dkt. 12 (Order). Thereafter, counsel worked together to maximize efficiency, avoid duplication, and obtain the best result for the Class.[17] There is nothing unusual or improper about any of this; it is civil procedure under the Federal Rules. The fact that many of these same firms ended up working together in other TCPA cases does not suggest—much less establish—anything different. It is common for the same firms to practice in the same substantive areas of the law—it is how expertise is developed—and equally common for them to ultimately end up on the same side of the "v.," particularly in MDLs where cases that were filed independently from across the country are combined. Indeed, counsel are urged to

---

[17] *See* Dkt. 177 (9/29/14 Selbin Fee Decl.).

engage in such private ordering as best practices, and were in fact ordered by the District Court to do so here.  *See* Dkt. 7 (Minute Order); MCL 4th, §21.272.

Nor is there "undisputed evidence that previous private fee division agreements in TCPA settlements provided windfalls to attorneys who contributed little to the proceedings."  CCAF App. Br. at 41.  The only "evidence" is derived from the confidential discovery CCAF obtained below of the final fee allocation in those cases. But in each, Class counsel submitted publicly-available declarations summarizing (and, in several instances, the detailed records of) their work.  Rather than analyzing those submissions to learn who did what, CCAF focused solely on the final return on lodestar for each firm, again elevating a single factor above all others.

### D.    There is No Basis—or Sound Reason—for Overruling this Court's Longstanding Fee Jurisprudence.

Appellants concede that their argument for limiting Class counsel to a pure lodestar recovery would require this Court to overrule controlling authority and is made solely to preserve their appellate rights, so Plaintiffs will not address it at length. However, a few points are worth noting.

First, it is not just this Court's opinion in *Florin* that would have to be overruled. This Court has long recognized the fundamental distinction between statutory fee shifting cases like *Perdue v. Kenny A.*, 559 U.S. 542 (2010) and *City of Burlington v. Dague,* 505 U.S. 557 (1992) and common fund cases like this.  *See Continental*, 962 F.2d at 573.

Second, this Court has expressly rejected the notion that in cases where the percentage of the fund method results in high multiples on lodestar, the fee must be

reduced.  In *Williams*, this Court held that "consideration of a lodestar check is not an issue of required methodology" and noted it has "never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach." 658 F.3d at 636 (citation and quotation omitted).

Third, as many courts and scholars have long recognized, in addition to undercompensating lawyers and thus disincentivizing them from taking contingent cases, the lodestar approach creates perverse incentives for lawyers to run up hours for the purpose of obtaining fees, rather than litigating efficiently.  *See* Dkt. 302-2 (Fitzpatrick Supp. Report), ¶ 6; Dkt. 271 (Rosenberg Report), at 7.  As this Court put it, "One advantage of the contingent fee is that the client (or the judge as protector of the class's interests) need not monitor how many hours the lawyers prudently devoted to the case."  *Synthroid II*, 325 F.3d at 979-80; *see also* Court Awarded Attorney Fees:  Report of the Third Circuit Task Force, reprinted in 108 F.R.D. 237, 242–46 (1985).

Fourth, the lodestar approach requires a herculean task by courts to review and synthesize the work performed by counsel.  *See* Dkt. 302-3 (Fitzpatrick Supp. Report) ¶ 6; Dkt. 271 (Rosenberg Report) at 9-10; *see also Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269-70 (D.C. Cir. 1993); 14 Moore's Federal Practice P 32-14 (2015).  This Court, too, has acknowledged these problems, concluding that while a District Court has discretion to employ either approach, "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."  *Florin*, 34 F.3d at 566.

**Conclusion**

The District Court conducted a remarkably thorough review of the Settlement and Class counsel's fee request.  It issued a lengthy and detailed analysis, considering and rejecting the objections, approving the Settlement, and concluding that a fee award of 20.77% of the non-reversionary cash fund is appropriate.  Nothing in the objections below or papers here even suggests any abuse of discretion.

Plaintiffs respectfully request that the decision below be affirmed in full.

Dated:  June 17, 2015

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


/s/ Jonathan D. Selbin
Jonathan D. Selbin
Douglas Cuthbertson
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000

*Counsel of Record*

TERRELL MARSHALL DAUDT & WILLIE PLLC
Beth E. Terrell
936 North 34th Street, Suite 400
Seattle, WA  98103
Telephone:  (206) 816-6603

- 49 -

KEOGH LAW, LTD
Keith James Keogh
55 W. Monroe
Suite 3390
Chicago, IL  60603
Telephone:  (312) 726-1092

*Additional Appellees' Counsel*

**Statement Regarding Oral Argument**

Plaintiffs request under Cir. R. 34(f) that the Court hear oral argument in this case which concerns this Court's jurisprudence on the most appropriate method for allocating attorneys' fees in common fund class action cases.  Plaintiffs believe that oral argument will enable the Court to more easily render a decision.

**Certificate of Compliance**

**with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Times Book Antiqua font.

3.    All materials required by Cir. R. 30(a) & (b) are included in the appendix to be filed separately.

Executed on June 17, 2015.

/s/ Jonathan D. Selbin
Jonathan D. Selbin

1261968.3

**Proof of Service**

I hereby certify that on June 17, 2015, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).

In addition, I hereby certify that on June 18, 2015, I caused a copy of the forgoing to be sent by first-class mail to the following address:

> Pamela McCoy
> 6801 Garrett Road
> Ravenna, OH 44266

Executed on June 17, 2015.

*/s/ Jonathan D. Selbin*
Jonathan D. Selbin

# Short Appendix to Be Filed Separately

## Statement of Compliance
## with Circuit Rule 30(d)


All materials required by Cir. R. 30(a) & (b) are included in the Appendix of

Appellees Bridgett Amadeck, David Mack, Charles C. Patterson, Tiffany Alarcon, and

Andrew Kalik, which will be filed separately.


/s/ Jonathan D. Selbin
Jonathan D. Selbin
Douglas Cuthbertson
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000


*Counsel of Record*